Our next case for this morning is Lovette-Cephus v. Village of Park Forest. Mr. Pariko. Good morning, your honors. May it please the court. My name is Anthony Pariko. I represent the plaintiff appellant Jennifer Lovette-Cephus. This case is one of select enforcement and discrimination based on race and non-resident status of two ladies who were applying for a license to open a bakery in Park Forest. I may be missing something, but it looked to me like Tina Anderson, the Caucasian woman, was also told that she needed this three section sink and she also decided that it was a three compartment sink and she decides it's too expensive to do that. She wanted to put it in her garage and winds up using an off-site place, so it looked to me like they were subject to exactly the same requirements. Well, the important distinction is that there were three regulatory agencies from the municipality looking at the application. But why isn't the requirement of the three compartment sink exactly the same from Ms. Lovette-Cephus as it is from Ms. Anderson? Well, ultimately, Tina Anderson, the white Caucasian resident of Park Forest, was not required to put in a three compartment sink. Because she didn't bake in the garage. Right. And Ms. Lovette-Cephus was not going to bake in the storefront that she was going to lease. And so she wouldn't have needed the sink either. Correct. They required that she put in a sink. But she was going to have food service on her premises, correct? She was going to bake off-site, just like Ms. Anderson was. She was going to serve the items. Serve the items on-site, that's correct. And the Caucasian was not. Pardon me? The Caucasian was not. Her sales were going to be at fairs or something, right? That's correct. She was selling from her home to customers off-site. And they were frozen. She was storing them in her freezer and selling them in that way. You could certainly see why the village might say if there's on-site service, we need to have appropriate cleaning facilities. I would urge your honors to look at the totality of the circumstances here and consider that there's a strict scrutiny of regulation. Well, we need to find the difference first before we get to that. Right. So let me point those out if I can. Tina Anderson, white, female, resident of Park Forest, applied for a home business license at the same time that Lovett Sifas did. Hers was approved in less than two weeks. Ms. Sifas was never approved or denied, just was left out there hanging. There was no three-sink requirement for Ms. Anderson, no second license holder for Ms. Anderson. But you're skipping over, I think, all the important details. I mean, the only people who need the three-compartment sinks are the people who are doing something on the premises that causes that need to exist. Right. I mean, Ms. Anderson could have been opening a hardware store, and maybe she would have gotten a quick license and have no sink requirement. But we wouldn't say there was a distinction. And Ms. Lovett Sifas was prepared to install a three-compartment sink. I thought she eventually decided it was too expensive. Well, she obtained a contract, a licensed contractor, to do so at $3,000 for the job. But the village of Park Forest said, no, you have to use one of these pre-approved contractors on our favored list. And that contractor charged $10,000. That was the problem. So they were forcing her to limit her choices to do the job according to the building code properly by a licensed contractor because it wasn't one of their insiders, donors, on the favored list. She wanted to choose her own contractor. So do we know that the village let other people use contractors that were not on the list? Well, that depends. Well, I'm asking because if the village, for whatever reasons it might have had, probably bad ones, required everybody to simply use contractors on its approved list, then there's no discrimination. As I say, it may be a very bad rule. It might be expensive for people. But we need to see where's the difference. If she's the only one who's told you've got to pick from this list, that's one thing. But if everybody has to use the list, that's another. I can't testify because we never really developed that issue. I can't inform the court about that particular issue because we were never allowed to develop it. This was a motion for summary judgment that was granted by the district court judge. Okay, so we'll just take it that we don't have any evidence to show that this point would support differential treatment. What we have is the example between Tina Anderson and the plaintiff here, the appellant judge, and I think there are significant similarities in terms of what they were trying to do, both applying for a bakery-type business, baking business, and the one was treated differently because of her residence and her skin color, and the other was treated still differently. But this gets back to what Judge Woodard was saying. We don't know if requiring them to use a particularly approved contractor, we don't know if they were both sent to the same thing. Well, Ms. Cephas had the obligation, and she was approved initially, and then the Department of Health pulled her license application. So she was approved by the fire department, she was approved by the building department. I thought they were actually pretty happy for a while that there was going to be a bakery downtown. Exactly, exactly. And then the employee of the village, based on her scope of responsibility as a health inspector, said that in one case, home business doesn't need a three-compartment sink. In the other case, even though you're going to be baking offsite and selling the goods prepackaged, you need a three-compartment sink. And by the way, you have to do it for one of these people on the list. You can't bring in your own licensed contractor who is a certified plumber. So maybe you should talk a little bit about Monell liability, because you've sued the village itself, and so you've got to find your way under one of those theories. That's correct, Judge. The three ways that you can prove a Monell violation. Right, and we have in our brief and the reply brief outlined all of those arguments as to the three elements that have to be established. Number one, suffering a deprivation of constitutional right. Well, where's the evidence that the village – what jury could believe that the village of Park Forest runs a racially discriminatory license approval system? Because they have done this repeatedly in the past. They were sued numerous times by nine residents who were apartment renters in the village, and their units were searched without probable cause, without a search warrant. Why is that pertinent to this effort to open up a business? Well, it's pertinent, as the court found in the two cases that we cited that were brought against the village of Park Forest, where the judge in the circuit here said that the village began to focus on – this is the Torn Creek case in 2005 – on the 90 to 95 percent of Torn Creek residents being of African-American descent. The village, disliked the predominantly African-American makeup of Torn Creek, wanted to reduce the number of African-American residents. This is cited on page three of our reply brief. Yeah, I see, and page 13. It's a district court decision, and there's a level of generality that I'm very worried about in your arguments. Like, if the village on two occasions has been sued for racially discriminatory policies, you think that means that they either have a written policy that's racially discriminatory or a sufficient pattern or practice, or that there's a person with final decision-making authority? Yes, I believe that. It seems like that's quite an ambitious claim. I believe that there are two cases here, Judge, that show racial discrimination. Do either of those go to final judgment? Are those final judgments? Yes. The case of Torn Creek Apartments 3 LLC v. Villager Park Forest, a jury entered a verdict in favor of the plaintiff and against not only the village – this is on page four, top of our reply brief – but also against the individuals, Tom Mick, Lawrence Karestas, who were employees of the village. So there is a pattern of behavior here against African-Americans.  Not every case that's brought against the Village of Park Forest should just have that issue taken off the table, that it's just about damages. No, each case should be looked on its own facts, Judge. Well, then why? I mean, you've just said that they've discriminated in the past against African-Americans, and so that is permanently established. Well, it's established in those two cases that they violated rights of African-American residents who were – You see what I'm asking? I mean, why – because it was established in those two cases, why in 20 – you know, whenever this was, 2013, is it still established? Do we have any evidence that they never changed anything? Well, we were never really allowed to develop the facts sufficiently because the judge – Did you file a motion for more discovery? The judge granted the motion for summary judgment here. There was some discovery done, but not all that would have been done. And the difference here is that the court, as we have outlined both in our appellant's brief and the reply brief, Judge, that the application that – Seth has filed two applications, the first application in June of 2011 and the second application in January 2012, an amended application, to comply with some of the requests and requirements of the village administrators. Okay, you need to wrap up at this point. None of those were ruled on. They were not granted. They were not denied. They just left her hanging. They gave her no decision and forced her to go to Hammond, Indiana to open a business when, in fact, they said as a matter of policy that they wanted a downtown bakery by the train station. Okay. Thank you very much, Mr. Freichen. Mr. Hardigan. Good morning, Your Honors. Counsel, I guess I'm going to talk about the Thorn Creek case because I was on that case and went to verdict in front of Judge Feinerman in April of 2014, at which time a jury returned a verdict of not guilty for the village of Park Forest and its entire administration in regard to the racist claims. So it is something I'm very familiar with having dealt with it in a two-week jury trial. So that is wrong. So you were representing the village? I was. And what was the policy or custom in question in that case? It was a claim that the village was picking on some property owners to make the properties themselves more diverse, and we were engineering it in such a way to decrease the African-American population when that's clearly not true. Property owners as in owners of apartments? Yes. The plaintiffs were three LLCs from Michigan. But apart from the Thorn Creek case, there's a number of items that were mentioned by Mr. Prigget that I'd just like to address. There were not three agencies dealing with this application. It was the Health Department, and the Health Department never approved this application. If you look at Appendix 275 in June of 2011, her application included the three compartments saying it was something that she knew was required from the beginning. Is that a requirement? I mean, I should have looked before, but is that embodied in an ordinance or a regulation? You know, Judge, it's actually in the Illinois Administrative Code, which the village applies to places that are serving food. And is the key that they're serving food, or is it food preparation? Everything, food prep and serving, just anything that might implicate or touch upon the health code. So they don't have their own health code. The village doesn't. So it borrows from the Illinois Administrative Code. And I'm glad that you mentioned that Ms. Anderson was similarly required to install this three-compartment sink because it was overlooked by a plaintiff in the lower court, and it's something that Judge Duryegan found to be dispositive or at least persuasive. At Appendix 353 through 355, there's a letter addressed to Ms. Anderson where she wants to convert her garage to a commercial kitchen, and the village says, fine, but you've got to do A through Z. And Tina Anderson, who I met, and I obtained her affidavit, which, by the way, was unrebutted, said it was too expensive and I don't want to do that. So she took a different route. And if you look at... And is the reason she didn't need the sink notwithstanding because she was just getting the foodstuffs prepared off-site and freezing them? She was. So she wasn't actually serving. Right. And I compare it kind of like to a storefront versus like a food truck. There's some differences there. And here, Ms. Anderson elected to bake off-site, freeze everything, package it, dump it in her freezer, and then most of the stuff she sold was to the farmer's market. That was how she made most of her money.  So she really only did this for about a year. But, you know, this is the Caucasian comparator that, you know, council will have this panel believe is enough to sustain a heavy charge of racism against the village of Park Forest. And when you look at the record and really dig into it, you'll see that the village was requiring the same things of Ms. Anderson that they were requiring of Ms. Lovett-Civis, the difference being that Ms. Lovett-Civis didn't have the option to bake from her home. She could have, but was she going to bake her goods in Hammond and then market her products to Park Forest? That wasn't something that she could do. Who is the policymaker that decides that this code will be applied to functions that were being proposed here? The decision-maker, well, the policymaker would be, as far as whether to grant or deny the license, I would say would be the village manager. I mean, that's something designated by ordinance. Did you say the village manager? Right. But this person was not sued, right? No, that's Tom Misch. He was not. He had nothing to do with this. And I know Mr. Misch, there was some peripheral reference to him by Ms. Lovett-Civis in her deposition, but he had nothing to do with this. The main player here was, well, Monica DeLorde was the assistant to the economic development and planning head, and she was the one who was emailing plaintiffs and keeping her updated on things saying, you know, here's what you need to do. If you look through the record, and all these emails really tell the story, it shows that the village was doing everything it could to help her, and she never found the contractor. And the reason she didn't is because no one wanted to do it. If you look at one of the emails where she addresses Monica DeLorde, she says she's having no trouble finding a contractor, it's just nobody wants to do it and no one's able to do it. So it's not a question of whether or not there was a list, which I believe there was, and that's just to make sure that approved contractors are used rather than just anybody coming in to do work. Is that list in the record? It's not. It's not. And then to also address the record, you know, the record we sailed through with this case. It was a one-year litigation. There was never a request to extend discovery. There was no depositions taken of any of my people. No 56-F motions. No, nothing. So really the record consists of the plaintiff's deposition, numerous emails, an affidavit of Ms. Anderson, and a request to admit. So there was nothing that prevented the plaintiff from further developing the record, and I think that's to his detriment. There's nothing that prevented him on my end. I was happy to go through with discovery, but there wasn't any. So that's all Judge Driegan had to look at. So to say that the Health Department approved the application is also false. And also the Fire, Building, and Health Department, there was never approved. If you look at Appendix 299, you'll see where Ms. Delord writes on 12-16-11, she acknowledges that no building permits needed, but she will still need a pre-inspection from Fire, Building, and Health. And, quote, I'll do my best to get the earliest date available so we can get you open and running. Does that sound like a village that's trying to drive her out because of her race? It's nonsense. It really is. And it wasn't developed. Just out of curiosity, how far apart were these proposed locations for the stores? I'm sorry? The locations for these two stores, the bakeries. You know, Ms. Anderson. I mean, were they close proximity in the same neighborhood? Yeah. Well, Ms. Anderson lives in the village, so it was out of her home. But then Ms. Levatsefis wanted to open her location in the downtown district. That was the only location that she proposed. But it's a pretty small village. It is. I've been there quite a few times in that Thorn Creek case, and there's nothing going on in that downtown. And they did embrace any new applicant. Not bakeries. Not a bakery either, which, yeah, would be nice this morning. But, you know, they welcomed her. They did. And I think the evidence shows that. It's unfortunate that she couldn't afford this three-compartment sink and hand-washing sink that was essentially the straw that broke the camel's back. But she abandoned her plans. She's actually baking right now in Hammond. She's got a Facebook page, and evidently she's doing quite well. So I'm not saying that that means she didn't have a right to do business in Park Forest. Business is better in Indiana. It could be. But I'm not saying she didn't have a right to do business here. On this morning's panel, perhaps you should simply agree with that. That's right. So I think I'm out of time, but if there's any more questions. Not quite, but if you're finished, that's fine. Well, you know, I'm not. You know, I just want to make a comment on the Village of Park Forest, which is known for embracing diversity. It's one of the more diverse suburbs, and it was actually founded upon principles of diversity. And I want that stated for the record, because this is the second time in the past year that I've had to defend the Village of Park Forest against these types of charges. And I know that my client will appreciate that, and it's something that I'd like the panel to consider in deciding this appeal. Thank you. All right. Thank you very much. I think your time ran out, Mr. Pareto, but I'll give you a minute. Thank you very much. I would point your Honor's attention to page 4 of our reply brief. Contrary to defendant's assertion, in the case of Thorn Creek Apartments 3 LLC v. Village of Park Forest, Illinois, which is case number 08-CV-1225, and companion cases 08-4303 and 08-869 in the U.S. District Court of Northern District of Illinois, the jury entered a verdict in favor of the plaintiff and against the defendants, Tom Mick, the village manager, Lawrence Karestas, and Village of Park Forest. Now, there were other defendants who were sued, but the judgment was entered in their favor. But as far as these individuals are concerned, that's clearly in the record. Also, I would ask your Honor to take a look at the Thorn Creek Apartments, as I said, case 08-CV-1225, docket number 370. Tom Mick, the village manager, was found liable for racial discrimination in Thorn Creek, and he's the same individual that the defendant argues in its response to ultimate authority over the business license application. The person who had the health... Okay. You need to finish now. One last sentence. The person who had the authority and was the decision maker, Monica DeLorde, she was the final policymaker, so the business license, she worked with plaintiff and the plaintiff for a year almost tried to get this license, so clearly there was a desire there, Judge, to open. She could not because none was granted. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.